**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ALBERT BUTLER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL NO. 3:14-CV-1991-B-BK** |
| | § | |
| **THE CITY OF DALLAS, TEXAS and** | § | |
| **BRIAN BRADLEY,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**FINDINGS, CONCLUSIONS AND RECOMMENDATION**</u>

Pursuant to the District Court's *Order of Referral*, Doc. 29, this case has been referred to

the undersigned for a recommendation on Defendant City of Dallas's *Motion Pursuant to Rule*

*12(b)(6) to Dismiss the Plaintiff's Claims*, Doc. 26.  For the reasons that follow, the Court

recommends that the motion be **GRANTED IN PART**.

I.      **BACKGROUND**

Plaintiff's state and federal constitutional claims against Defendant City of Dallas ("the

City") arise out of Plaintiff's alleged assault by Dallas Police Department ("DPD") Officer Brian

Bradley.  Plaintiff alleges in his *Second Amended Complaint* that, on the day of the incident, he

was driving home from the store when Officer Bradley pulled him over despite the fact that

Plaintiff was not violating any laws.  Doc. 19 at 3-4.  Plaintiff avers that after he exited his

vehicle at Officer Bradley's request, the officer immediately began to search him despite lacking

probable cause and, when he realized he was in view of his car's dashboard camera, he led

Plaintiff to the back of his car and ordered him to the ground.  Doc. 19 at 4-5.  When Plaintiff

stated that he had an injury and could barely bend down, Officer Bradley grabbed Plaintiff by the

neck and forcefully threw him to the ground and repeatedly kicked and punched him and placed

his knee on Plaintiff's neck, interfering with his ability to breathe, while Plaintiff was restrained in handcuffs and screamed.  Doc. 19 at 4-5.  Plaintiff contends that during the attack, he vomited and had an asthma attack and, after the arrival of additional police officers, he was transported to the hospital for treatment of his injuries.  Doc. 19 at 5.  As a result of the attack, Plaintiff asserts that he suffered severe injuries to his back, his left wrist, his right hand, and his knees.  Doc. 19 at 5.  He also claims to have sustained multiple lacerations to his head, and that he has undergone numerous surgeries to repair the damage.  Doc. 19 at 5.  Plaintiff further alleges that Officer Bradley searched his vehicle without probable cause and, without probable cause, issued him a citation for making an improper turn in an attempt to cover up and justify his actions.  Doc. 19 at 5.

Plaintiff asserts that the actions of Officer Bradley are part of a pattern of conduct by Dallas Police ("DPD") officers, consisting of beatings, assaults and intimidation during arrest and booking procedures by which said officers, acting under color of law, have denied various persons the rights, privileges, and immunities guaranteed to them by the Constitution and laws of the United States.  Doc. 19 at 5.  He alleges that the City has a longstanding record of not providing DPD officers with adequate training and not preventing excessive force, racial profiling, or wrongful arrests by DPD officers.  Doc. 19 at 6.  Plaintiff additionally asserts that the City, City Manager A.C. Gonzalez, and Police Chief David Brown all knew of Officer Bradley's behavior and lack of training, but did nothing to protect Plaintiff and others.  Doc. 19 at 6.

Plaintiff notes that Dallas City Councilman Dwaine Caraway recently confirmed that the City Council and the City delegated policy-making authority for officer training to Chief Brown, and both Caraway and Chief Brown have admitted that there is a need for additional officer

training.  Doc. 19 at 6-7.  Plaintiff asserts that the lack of officer training and the DPD's official

custom or policies have resulted in (1) Dallas being at the top of the list of police misconduct

statistics in the South, along with several other Texas cities; (2) Dallas being ranked number 11

nationally in police misconduct rates; (3) Dallas being ranked second nationally in police

misconduct incidents; (4) since 2001, over 60 unarmed black men having been killed by DPD

officers; and (5) numerous individuals being harassed and/or arrested for no lawful reason

through the use of excessive force, including two individual incidents which Plaintiff details.

Doc. 19 at 7-8.

       Plaintiff alleges in the first count of the operative complaint, under the heading

"Excessive Force," that Officer Bradley wrongfully detained, arrested, and assaulted him through

the use of excessive force in violation of his Fourth Amendment rights.  Doc. 19 at 11-12.

Plaintiff contends that Officer Bradley was acting pursuant to the customs and policies of the

DPD regarding the use of deadly force as authorized and/or ratified by City Manager Gonzalez

Chief Brown.  Doc. 19 at 12.

       In Count II, under the heading "Racial Profiling," Plaintiff alleges that Officer Bradley

wrongfully used race as a proxy for reasonable suspicion and for his use of excessive force on

Plaintiff.  Doc. 19 at 12.  Additionally, Plaintiff asserts that the DPD has official customs,

policies, and practices authorized and/or ratified by City Manager Gonzalez and Chief Brown to

treat African-Americans cruelly regardless of the circumstances, and that Officer Bradley acted

pursuant to such customs and treated Plaintiff in the manner that he did because of Plaintiff's

race.  Doc. 19 at 12-13.

       In Count III, under the heading "Failure to Train," Plaintiff alleges that the City deprived

him of his Fourteenth Amendment rights by failing to provide proper training to DPD officers in

the use of excessive force.  Doc. 19 at 13.  He claims that Officer Bradley's use of excessive force against him was the result of the City's wrongful and reckless customs, policies, and procedures in failing to properly train DPD officers.  Doc. 19 at 14-15.  Plaintiff concludes that the City's failure to properly train DPD officers under Gonzalez's and Chief Brown's authority was the proximate cause of his injuries.  Doc. 19 at 16.

In Count IV, under the heading "False Arrest – 42 U.S.C. § 1983," Plaintiff asserts that Officer Bradley arrested him without probable cause in violation of the Fourth Amendment. Doc. 19 at 6-7.  Finally, Plaintiff raises a claim of negligence against both Officer Bradley and the City.  Doc. 19 at 18.  The City has now moved to dismiss Plaintiff's case pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. 26.

## II.   APPLICABLE LAW

A plaintiff fails to state a claim for relief under Rule 12(b)(6) when the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In order to overcome a Rule 12(b)(6) motion, a plaintiff's complaint should "contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference may fairly be drawn that evidence on these material points will be introduced at trial." *Campbell v. City of San Antonio,* 43 F.3d 973, 975 (5th Cir. 1995) (quotation omitted).  The complaint should not simply contain conclusory allegations, but must be pled with a certain level of factual specificity, and the district court cannot "accept as true conclusory allegations or unwarranted deductions of fact." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quotation omitted).

Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the

United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). To state a claim under

section 1983, a plaintiff must allege facts that show he has been deprived of a right secured by

the Constitution and the laws of the United States, and the defendants were acting under color of

state law. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978). To survive a motion to

dismiss, an individual can provide fair notice of his claim to a municipality by, *inter alia*,

describing (1) past incidents of misconduct by the defendant; (2) multiple harms that occurred to

the plaintiff himself; (3) the involvement of multiple officials in the misconduct; or (4) the

specific topic of the challenged policy or training inadequacy. *Thomas v. City of Galveston*, 800

F.Supp.2d 826, 843-44 (S.D. Tex. 2011) (citing cases involving failure to train). Those types of

details, together with any additional elaboration  possible, help to (1) "satisfy the requirement of

providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim

rests," *Twombly*, 550 U.S. at 555 n.3; and (2) "permit the court to infer more than the mere

possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## III. ARGUMENTS AND ANALYSIS

### A.  Failure to Train – Municipal Liability

A city does not automatically incur section 1983 liability for injuries caused solely by its

employees, and it cannot be held liable under section 1983 on a *respondeat superior* theory.

*Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 691, 694 (1978); *Johnson

v. Deep East Tex. Reg'l Narcotics*, 379 F.3d 293, 308 (5th Cir. 2004). Moreover, a municipality

is almost never liable for an isolated unconstitutional act on the part of an employee. *Piotrowski

v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Rather, to establish municipal liability

under section 1983 requires the existence of: (1) a policymaker; (2) an official policy; and (3) a

violation of constitutional rights whose "moving force" is the policy or custom.  *Monell*, 436 U.S. at 694.

Actual or constructive knowledge of the unconstitutional custom must be attributable to the county's governing body or to the official to whom policy-making authority has been delegated.  *Johnson*, 379 F.3d at 309.  Actual knowledge can be shown by such means as the topic being discussed at city council meetings.  *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) *(en banc)*.  "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity."  *Id.*  Finally, Plaintiff must establish that the policy at issue was the moving force behind the constitutional violations.  *Monell*, 436 U.S. at 694.  In other words, Plaintiff must show a direct causal link between the policy and the violations.  *Piotrowski*, 237 F.3d at 580; *see also Johnson*, 379 F.3d at 310 (there "must be more than a mere 'but for' coupling between cause and effect"; the policy "must be closely related to the ultimate injury" and have "actually caused" the constitutional violation complained of).

### 1.  Chief Brown as Final Policymaker

The City argues as an initial matter that the claims against it must be dismissed because Plaintiff's assertion that Chief Brown is the final policymaker for officer training is incorrect as a matter of law.  As Plaintiff correctly points out, the City has previously raised and lost that argument.  *See Flanagan v. City of Dallas*, 48 F.Supp.3d 941 (N.D. Tex. 2014) (Lynn, J.) (adopting magistrate judge's recommendation).

The identification of officials whose decisions represent the official policy of a local governmental unit is a question of state law to be resolved by the trial judge. *Worsham v. City of Pasadena*, 881 F.2d 1336, 1343 (5th Cir. 1989). Unconstitutional policy is attributable to the governing body of a city where the policy was made by an official to whom the governing body gave policymaking authority. *Bennett*, 728 F.2d at 768. A lawmaking officer is one who has "final authority to establish municipal policy with respect to the . . . subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 483 (1986). "Policymakers act in the place of the governing body in the area of their responsibility; they are not supervised except as to the totality of their performance." *Bennett*, 728 F.2d at 769. The governing body retains financial control and final legal control by which it may limit or revoke the authority of the official. *Id.* The relinquishment of policymaking authority and supervision by the governing body is much more likely to exist, by necessity, as the size and complexity of the government increase. *Id.* The governing body may delegate policymaking authority either expressly or it may, by conduct or practice, acknowledge the delegee's status as a policymaker. *Id.* Either way, the delegation of such authority requires more than a showing of mere discretion or decision-making authority on the delegee's part. *Id.*

Chapter VI of the Dallas City Charter requires the City Council to appoint a City Manager, who is responsible for the proper administration of all City affairs and is subject to the Council's supervision. *Id.* at ch. VI, §§1, 2. The Charter further provides that the Chief of Police has "control of the police department, subject to the supervision of the city manager . . ." *Id.* at ch. XII, § 2(1). In several cases, this language has been cited in finding that the Dallas Chief of Police is not a policymaker for purposes of section 1983 liability. *See Moreno v. City of Dallas*, Case No. 13-CV-4106-B, 2015 WL 3890467, at *5 (N.D. Tex. 2015) (Boyle, J.)

(dismissing excessive force claim because "unfortunately, unlike the plaintiff in *Flanagan*," the plaintiff did not allege that Councilman Caraway had stated that the City Council had delegated policy-making authority for DPD officer training to Chief Brown); *Guzman v. City of Dallas, No. 09-cv-2426-B-BD, 2010 WL 4514369, at *3 (N.D. Tex. 2010)* (Kaplan, J.) (recommending dismissal of a claim against the City of Dallas based on a finding that the Chief of Police is not the City's final policymaker for the DPD), *adopted by* 2010 WL 4514364 (N.D. Tex. 2010) (Boyle, J.); *Mosser v. Haney*, No. 03-CV-2260-B, 2005 WL 1421440, at *4 (N.D. Tex. 2005) (Boyle, J.) (rejecting the plaintiff's contention in summary judgment proceedings that the Chief of Police was a final policymaker for the DPD).  As did the plaintiffs in *Flanagan*, however, Plaintiff avers in his *Second Amended Complaint* that Councilman Caraway recently confirmed that the City Council had delegated policy-making authority for police officer training to Chief Brown.  Doc. 19 at 6-7.

The City charges that this contention is conclusory.  Doc. 26 at 17.  It is well established that "conclusory allegations will not suffice to prevent a motion to dismiss, and neither will unwarranted deductions of fact." *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (alteration, citation, and internal quotation marks omitted).  Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations and footnote omitted).  Upon consideration, the undersigned finds that Plaintiff's allegation regarding Councilman Caraway's statement is not so conclusory that it cannot support Plaintiff's allegation that the City has delegated to Chief Brown policy-making authority in the area of police training.  *Id.*  Although Plaintiff could have added more specificity to his allegation by including the date on which Councilman Caraway made his statement and to

8

which media source, for example, Plaintiff is not required to plead so specifically at this stage.

*See Schultea v. Wood*, 47 F.3d 1427, 1433-34 (5th Cir. 1995) (*en banc*) (holding that a

heightened pleading standard only applies to section 1983 cases after the plaintiff is ordered to

submit a Rule 7(a) reply following a defendant's assertion of qualified immunity); Doc. 39

(District Judge order denying *Motion for a Rule 7(a) Reply*).  Moreover, despite the handful of

older cases the City cites and the language of the City Charter that purports to limit Chief

Brown's authority, it is plausible that the City Council has more recently delegated policymaking

authority to Chief Brown in the area of training his officers in the use of force.  *See Worsham,*

881 F.2d at 1344 (noting that a policymaker can delegate final policymaking authority to a

delegee even in the face of positive law); *Moreno*, 2015 WL 3890467 at *5 (noting that it is

conceivable, despite older cases finding to the contrary, that the City Council more recently

delegated DPD policy-making authority to Chief Brown).

 2. Existence of a Custom or Policy

 The City next argues that Plaintiff fails to plead sufficiently (1) the customs he attempts

to allege; (2) facts showing that the City's final policymakers were aware of those customs; and

(3) facts showing that the City's final policymakers were deliberately indifferent to a known or

obvious risk of the harms alleged.  Doc. 26 at 18-19.  In particular, the City maintains that

Plaintiff has not identified any written policy that is facially unconstitutional nor has he pled any

facts supporting the inference of a DPD practice of unlawful seizures or use of excessive force

that is so persistent and widespread that it fairly represents City policy.  Doc. 26 at 20-23.

Instead, Plaintiff has pled only two instances of alleged excessive force, namely his own

encounter with Officer Bradley, which does not support the existence of a custom or policy.

Doc. 26 at 21.

Plaintiff responds that his amended complaint sufficiently identifies facts showing that DPD has a policy permitting the use of excessive force. Doc. 31 at 15. In particular, Plaintiff points to the *Second Amended Complaint*'s allegations that, *inter alia*, (1) although Plaintiff was cooperating with Officer Bradley's instructions, the officer threw him to the ground and kicked and punched him and placed his knee on Plaintiff's neck, making it difficult for him to breathe; (2) Officer Bradley continued to assault Plaintiff, even after Plaintiff was screaming in pain, vomiting, and having an asthma attack; (3) as a result of Officer Bradley's actions, Plaintiff was hospitalized and suffered severe nerve damage, as well as injuries to his head, back, left wrist, right hand, and knees, requiring multiple surgeries; (4) Dallas has recently been ranked among the worst in police misconduct among cities throughout the South; and (5) there have been numerous incidents in the past five years involving harassment and unlawful arrests by DPD officers. Doc. 31 at 15-16. Plaintiff claims that he can survive the City's motion to dismiss by alleging general facts which point to prior violations by the DPD, past incidents of misconduct to others, multiple harms that occurred to himself, misconduct that occurred in the open, the involvement of multiple officials in the misconduct, and DPD's training inadequacies. Doc. 31 at 17 (citing *Thomas*, 800 F.Supp.2d at 843 & nn. 8-14).

A policy or custom can be either (1) a policy statement or rule that is officially promulgated by the county's lawmaking officers or a delegated official; or (2) a persistent, widespread practice of county officials or employees, which is so common and well settled as to constitute a custom that fairly represents county policy. *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (noting that a policy can develop "by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity."); *Webster v.*

*City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (stating that if the actions of city employees are to be used to prove a custom for which the municipality can be held liable, "those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.").  In describing the term "custom," the Supreme Court has used such phrases as "persistent and widespread . . . practices," "systematic maladministration" of the laws, practices that are "permanent and well settled," and "deeply embedded traditional ways of carrying out . . . policy." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970).

Upon review, Plaintiff has pled several facts in support of his assertion that one may reasonably infer the existence of a persistent, widespread practice of DPD officers using excessive force.  In particular, Plaintiff alleged in his amended complaint that (1) Dallas ranks near the top of the nation in police misconduct; (2) since 2001, over 60 unarmed black men have been killed by DPD offers; and (3) numerous individuals have been harassed and/or arrested for no lawful reason through the use of excessive force by DPD officers.  Doc. 19 at 7-8.  In addition to detailing the events that led to his arrest and injuries, Plaintiff describes two more incidents of alleged excessive force by DPD officers against other individuals.  Doc. 19 at 7-8.

Thus, plainly contrary to the City's argument, Plaintiff has pled more than one instance of an unlawful seizure and use of force.  The question is whether Plaintiff's allegations are sufficient to demonstrate a practice of DPD officers using excessive force which constitutes a persistent and widespread practice within the DPD.  The City points to the *Pineda v. City of Houston* to argue that he has not.  In that case, the appellate court upheld the summary judgment dismissal of plaintiffs' case, holding that 11 allegedly unconstitutional searches based on warrantless entries were not sufficient to establish a custom or practice.  *Pineda v. City of*

*Houston*, 291 F.3d 325, 329 (5th Cir. 2002). The court noted that the plaintiffs had drawn a sample size of ten percent of relevant offense reports, culled those to locate unconstitutional warrantless entries, and persuaded the district court that the 11 incidents which fit the criteria were enough to defeat a summary judgment motion. *Id.* The appellate court reversed, noting both that the inference of the searches' illegality was not compelling and that the sample size was too small considering the size of Houston and its police force. *Id.*

The undersigned finds *Pineda* to be of limited persuasiveness given the factual differences between it and the present case. First, although the appellate court does not say so, the 11 sample cases that the *Pineda* court looked at spanned a four-year period. *Pineda v. City of Houston*, 124 F. Supp. 2d 1057, 1070 (S.D. Tex. 2000). In this case, Plaintiff alleges that since 2001, over 60 unarmed black men have been killed by DPD officers and numerous others have been subjected to the illegal use of excessive force. Doc. 19 at 7-8. *See McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989) (stating that a pattern requires "sufficiently numerous prior incidents" as opposed to "isolated instances.").[1] Additionally, Plaintiff described two excessive force incidents in sufficient detail in his amended complaint to denote the similarities to Plaintiff's incident, namely that the individuals involved were not provoking or resisting the police when they were allegedly taken down with excessive force by DPD officers. Doc. 19 at 7-8.

Further distinguishing *Pineda* and much of the other case law that addresses custom and pattern is the procedural posture of this matter. There is no evidence before Court at this stage of the proceedings, whereas many decisions on this subject involve motions supported by evidence

---

[1] Although Plaintiff relies on deadly force incidents in addition to excessive force incidents that did not involve death, the Supreme Court has stated that the standard by which all such incidents are judged in the context of a section 1983 action is the same. *Scott v. Harris*, 550 U.S. 372, 381-82 (2007). The undersigned thus finds no reason to draw a distinction in this case.

obtained through discovery.  *See, e.g.*, *Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir.

2009) (appeal of summary judgment); *Pineda*, 291 F.3d 325 (same).  In *Peterson* and *Pineda*, the

Fifth Circuit discussed and evaluated the evidence in detail and observed that, even after

discovery, the plaintiffs had no evidence of a pattern beyond a bare list of prior incidents. *See*

*Peterson*, 588 F.3d at 851 ("The incidents allege use of force that, if true, would be emphatically

excessive.  Nevertheless, assuming their truth, the incidents do not, on the basis of this record,

tell us that the City maintained an official policy of condoning excessive force. The failure of the

evidence is that the plaintiffs have failed to provide context that would show a pattern of

establishing a municipal policy."); *Pineda*, 291 F.3d at 329 ("From 5,000 offense reports

produced by the City in discovery, counsel selected approximately 500 involving narcotics.

These were the predicate for opinion evidence on custom by their expert witnesses. While the

opinions offered referred to a greater number of incidents, the district court considered only

those accompanied by offense reports in the summary judgment record.").  In contrast, at this

juncture, the Court must only evaluate whether Plaintiff pled sufficient facts that would "allow

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Iqbal*, 556 U.S. at 678.

    While it is a close call, taking all of Plaintiff's allegations to be true, the undersigned

finds that Plaintiff has pled sufficient facts from which one could reasonably infer the existence

of a persistent, widespread practice by DPD officers of using excessive force rising to the level

of a custom that has the effect of official City policy.  *See Oporto v. City of El Paso*, No. 10-CV-

110-KC, 2010 WL 3503457, *6 (W.D. Tex. 2010) (declining to dismiss a policy of excessive

force claim when the plaintiff alleged 32 prior incidents of excessive deadly force spanning 15

years); *Rivera v. City of San Antonio*, No. SA-06-CA-235-XR, 2006 WL 3340908, *12 (W.D.

Tex. 2006) (finding that an allegation of hundreds of complaints against police officers for excessive force, without any disciplinary action taken, was sufficient to state a claim supporting a municipal policy); *Barr v. City of San Antonio*, No. 06-CV-261, 2006 WL 2322861 (W.D. Tex. 2006) (finding that a pattern was adequately alleged at the motion to dismiss stage where the plaintiff (1) claimed that police officers believed they were entitled to stop and arrest any person they chose without probable cause and (2) cited four other similar lawsuits against the city); *cf.* *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009) (affirming summary judgment holding that 27 complaints of excessive force over a three-year period were not sufficient to establish a pattern of excessive force that could be said to represent official policy); *Allen v. Burnett*, No. 12-cv-4863-O, 2013 WL 2151218, *3 (N.D. Tex. 2013) (O'Connor, J.) (dismissing as frivolous a municipal liability claim when the plaintiff only alleged one improper police action, which was committed against him, in arguing that the police department had adopted an unconstitutional policy or custom).

### 3. Deliberate Indifference of a Policymaker

The City next asserts that Plaintiff failed to plead any facts from which the Court could rationally infer that Chief Brown acted with deliberate indifference knowing that the DPD's customs would result in the deprivation of constitutional rights. Doc. 26 at 23-24. Plaintiff responds that his failure to train claim is not subject to dismissal because he has alleged facts which point to (1) past incidents of misconduct against individuals by DPD officers; (2) multiple harms that he suffered; (3) misconduct that occurred in the open; and (4) the effects of the challenged policy or training inadequacy. Doc. 31 at 17, 22.

For a municipality to be liable based on its policy, a plaintiff must show either (1) that the policy itself violated federal law or authorized or directed the deprivation of federal rights; or (2)

14

"that the policy was adopted or maintained by the municipality's policymakers with 'deliberate indifference' as to its known or obvious consequences . . . A showing of simple or even heightened negligence will not suffice." *Johnson*, 379 F.3d at 309 (quotation omitted).  The latter showing "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).  "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998).  Where the constitutional violations are flagrant or severe, the fact finder may require a shorter pattern of the conduct to show that diligent governing body members would necessarily have learned of the objectionable practice and agreed to its continuation.  *Bennett I*, 728 F.2d at 768.

        "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  Nevertheless, under certain circumstances, a municipality can be liable for a failure to train its employees.  *See Conner v. Travis Cty.*, 209 F.3d 794, 796 (5th Cir. 2000).  In such cases, the plaintiff must show that: "(1) the municipality's training policy procedures were inadequate, (2) the municipality was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused the constitutional violation." *Kitchen v. Dallas Cty.*, 759 F.3d 468, 484 (5th Cir. 2014).  There are two ways for a plaintiff to establish a municipality's deliberate indifference to the need for proper training. The most common

approach is for the plaintiff to demonstrate that a municipality had "[n]otice of a pattern of similar violations," which were "fairly similar to what ultimately transpired" when the plaintiff's own constitutional rights were violated.  *Id.*  The second approach is the limited exception for "single-incident liability" in the rare case where a constitutional violation would result from "the highly predictable consequence" of a particular failure to train.  *Id.*

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform, and the identified deficiency in a city's training program must be closely related to the ultimate injury.  *City of Canton*, 489 U.S. 378, 390-91 (1989).  Thus, in order to properly plead a claim based upon the alleged City custom of deficient training, Plaintiff must plead facts supporting deliberate indifference by the Chief Brown to a specific inadequacy in the City's training of DPD officers.  The Supreme Court has noted that city policymakers know with certainty that their police officers will be required to arrest fleeing felons and therefore that the need to train officers in the constitutional limitations on the use of deadly force is "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.  *Id*. at 390 n.10 (citing *Garner*, 471 U.S. 1).  The High Court also noted the possibility that the police, in exercising their discretion, so often violate constitutional rights that the need for further training in the use of deadly force must be obvious to city policymakers, who, nevertheless, are "deliberately indifferent" to the need, thereby rendering the city liable.  *Id.*

Upon consideration, the Court finds that Plaintiff has pled adequate facts demonstrating that Chief Brown, as alleged to be the City's final policymaker, has adopted or at least maintained a policy of DPD officer use of excessive force with deliberate indifference to its known or obvious consequences.  *Johnson*, 379 F.3d at 309.  Taking Plaintiff's well pled facts as

true, Chief Brown himself has acknowledged that DPD officers need more training.  Doc. 19 at 6-7.  That, together with the large number of shootings by DPD officers over the past 15 years of unarmed individuals and Plaintiff's allegations of the use of excessive force against numerous individuals both named and unnamed, is sufficient to maintain a failure to train claim at this early stage of the proceedings.  *Burge*, 336 F.3d at 370 (stating that to show that a policy was adopted or maintained by policymakers with deliberate indifference to its known or obvious consequences "generally requires that a plaintiff demonstrate at least a pattern of similar violations.").

### B. Racial Profiling

The City next asserts that Plaintiff's claim for racial profiling must be dismissed because he has asserted no facts to support his allegation that African Americans and similarly situated non-African Americans are treated differently by DPD officers.  Doc. 26 at 26-27.  Plaintiff responds that his factual allegations are sufficient to state a racial profiling claim, and the court should draw on its own experience and common sense to find it plausible that racism exists in the DPD.[2]  Doc. 31 at 23-24.

"Selectivity in the enforcement of criminal laws is subject to constitutional restraints," and the rubric for analyzing a racial profiling claim thus draws on "ordinary equal protection standards."  *Wayte v. United States*, 407 U.S. 598, 608 (1985).  To state a claim of racial profiling under the Equal Protection Clause and section 1983, a plaintiff must allege that he was treated differently than similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.  *Bowlby v. City of Aberdeen*, 681 F.3d 215, 227 (5th Cir. 2012).

---

[2] Plaintiff candidly admits that Judge Lynn dismissed this same racial profiling claim in *Flanagan*.  Doc. 31 at 25.  The Court appreciates counsel's candor.

A review of the operative complaint reveals that Plaintiff's racial profiling claim does not contain any allegation that he was treated differently than similarly situated non-African Americans. Doc. 19 at 12-13. Even if true that racism abounds in many areas of the country, including Dallas, as a matter of law Plaintiff cannot state an equal protection claim if he does not allege that he was treated differently than similarly situated individuals of another race. Accordingly, his racial profiling claim should be dismissed. *Bowlby*, 681 F.3d at 227.

### C. State Law Negligence Claim

1. Officer Bradley

The City urges that the negligence claim against Officer Bradley is subject to dismissal under the Texas election of remedies statute because a tort claim may not be brought against both a government employee and the government unit for which he or she works. Doc. 26 at 28. Plaintiff does not address this argument.

The Texas election of remedies statute provides that if "a suit is filed under this chapter against both a governmental unit and any of its employees, the employees *shall immediately be dismissed* on the filing of a motion by the governmental unit." TEX. CIV. PRAC. & REM. CODE § 101.106(e) (emphasis added). Plaintiff has sued Officer Bradley as an officer and employee of the City. Accordingly, his state law claim against Officer Bradley should be dismissed with prejudice.

2. The City

The City next urges that Plaintiff's negligence claim against it should be dismissed because he is merely repackaging an intentional tort as negligence, and the City is immune from an intentional tort claim. Doc. 26 at 28-29, 32. Plaintiff responds that he may have a cause of action against the City for negligent supervision or training if he can plead that the negligence

18

involved "tangible personal property" such as the handcuffs used to restrain him.  Doc. 31 at 25-26.  Alternatively, he requests leave to amend his complaint.  Doc. 31 at 26-29.

The Texas Tort Claims Act ("TTCA") provides that a governmental unit enjoys sovereign immunity for "a claim arising out of assault, battery, false imprisonment, or any other intentional tort."  TEX. CIV. PRAC. & REM. CODE § 101.057(2).   Relatedly, the TTCA extends immunity to acts "arising out of the same conduct that formed the basis of the intentional tort claims against its employee."  *Goodman v. Harris Cty.*, 571 F.3d 388, 394 (5th Cir. 2009) (internal citations omitted); *Tex. Dep't of Pub. Safety v. Petta*, 44 S.W.3d 575, 580 (Tex. 2001) (extending immunity to the plaintiff's negligence claims which arose from the same conduct that formed the basis of his assault and battery claims).  Even where a plaintiff labels his claim as "negligence," that claim will be barred if the label is merely a fiction and the claim instead arises out of an intentional tort.  *See, e.g.*, *McCord v. Mem'l Med. Ctr. Hosp.*, 750 S.W.2d 362, 363 (Tex.App.--Corpus Christi 1988) (upholding dismissal of negligent hiring and supervision claims on summary judgment because the nightstick a security guard allegedly used to beat the plaintiff was used during the commission of an intentional tort).

At this stage of the proceedings, the undersigned cannot say with certainty that a claim against the City for negligent supervision, training or the like, which does not "arise from" Officer Bradley's alleged actions, is entirely implausible.  *Twombly*, 550 U.S. at 570; *see Russell v. City of Houston*, 808 F. Supp. 2d 969, 975 (S.D. Tex. 2011) (denying motion to dismiss negligence claim against a municipality on the basis that the plaintiff's claims did not arise from a police officer's intentional conduct, but rather out of the city's allegedly negligent issuance to him of the handcuffs that he used during his sexual assault of an arrestee); *Centamore v. City of Houston*, 9 F. Supp. 2d 717, 7325 (S.D. Tex. 1997) (finding sufficient to overcome immunity

plaintiff's allegation that the city's "conduct in entrusting tangible property combined with inadequate supervision" of police officer's use of such property was negligent); *cf. Young v. City of Dimmitt*, 787 S.W.2d 50, 51 (Tex. 1990) (expressly disapproving of the appellate court's statement that "the officer['s] intentional tortious action . . . precludes an application of [sovereign immunity]" where the plaintiff's negligent employment and entrustment claims arose "out of the alleged negligence of the city employees supervising the officer, not out of the officer's intentional tort").

Plaintiff contends that he may be able to state a claim pursuant to section 101.021 of the TTCA, which waives sovereign immunity for claims of "personal injury and death caused by a condition or use of tangible personal or real property." TEX. CIV. PRAC. & REM. CODE § 101.021(2). To state such a claim, Plaintiff must allege that (1) the property was used or misused by a governmental employee acting within the scope of his employment; and (2) the use or misuse of the property was a contributing factor to the injury. *Morin v. Moore*, 309 F.3d 316, 328 (5th Cir. 2002). In view of the allegations in the *Second Amended Complaint* and his response to the instant dismissal motion, he may be able to do so.

A "badge, police uniform, gun, handcuffs, communication device(s) and/or car" all constitute tangible property. *Jefferson Cnty. v. Sterk*, 830 S.W.2d 260, 262 (Tex.App.--Beaumont 1992). In *Russell*, the district court denied the city's motion to dismiss a negligence claim, finding sufficient the plaintiff's allegations that the city had issued handcuffs to a police officer, constituting tangible personal property, and the officer had then used the handcuffs during his sexual assault of the plaintiff. 808 F. Supp. 2d at 975; *see also Centamore*, 9 F. Supp. 2d 717, 7325 (S.D. Tex. 1997) (noting that tangible property under the TTCA includes a police officer's badge, uniform, gun, radio, computer, and car). Upon consideration of the above law,

the pleadings, and the parties' arguments, the undersigned concludes that Plaintiff may be able to state a claim for negligence against the City although his claim, as currently pled, does not meet that standard and should be dismissed.

### D.  Leave to Amend

Plaintiff has requested leave to amend his claims should the Court determine they are subject to dismissal.  A court may dismiss a claim that fails to meet the pleading requirements, but "it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after repeated opportunities to do so." *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000).

Here, as previously discussed, Plaintiff's negligence claim against Officer Bradley is not legally debatable.  Accordingly, granting leave to amend that claim would be futile and cause needless delay.  *See Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986) ("At some point a court must decide that a plaintiff has had fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit.").  In sum, Plaintiff's negligence claim against Officer Bradley should be dismissed with prejudice.  *See McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 561-62 (5th Cir. 1998) (noting that dismissal with prejudice is appropriate  if it appears that no relief can be granted under any set of facts that could be proven consistent with the plaintiff's allegations).

However, it is *possible* that Plaintiff can state a claim for racial profiling if given the opportunity to amend his complaint to state that he was treated differently than similarly situated non-African Americans, assuming that to be accurate.  Moreover, as noted above, Plaintiff may be able to state a cognizable negligence claim against the City if permitted to amend his

complaint.  Thus, Plaintiff should be granted leave to amend his racial profiling and negligence claims against the City.  *Brewster*, 587 F.3d at 767-68.

IV.     **CONCLUSION**

For the reasons stated herein, it is recommended that the City's *Motion Pursuant to Rule 12(b)(6) to Dismiss the Plaintiff's Claims*, Doc. 26, be **GRANTED IN PART**.  Plaintiff's negligence claim against Officer Bradley should be **DISMISSED WITH PREJUDICE**.  As to Plaintiff's racial profiling and negligence claims against the City, Plaintiff is granted until **November 18, 2015** to amend those claims to cure the deficiencies noted herein.  Should he fail to do so, those claims should also be **DISMISSED WITH PREJUDICE**, *sua sponte* or upon timely re-urging by Defendants.  In all other respects, it is recommended that the City's motion be **DENIED**.

**SO RECOMMENDED** on November 4, 2015.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

22

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996).

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

23